UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:15-cr-20561-KMM-2

UNITED STATES OF AMERICA,

v.

AARON STEPHENS HINES,

    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON PETITION FOR REVOCATION OF SUPERVISED RELEASE

**THIS MATTER** arose on a Petition for Revocation of Supervised Release (the "Petition") filed against Defendant Aaron Stephen Hines ("Defendant") (ECF No. 123). The Honorable K. Michael Moore, Chief United States District Judge, referred this matter to the undersigned Magistrate Judge for all necessary and proper action with respect to any and all violations of supervised release (ECF No. 129). An evidentiary hearing was held on September 21, 2021. For the reasons set forth below, the undersigned **RECOMMENDS** that the Petition be **GRANTED** as to Violations 1-3, and **DENIED** as to Violations 4-6.

### I. BACKGROUND

On March 14, 2018, Defendant commenced a term of supervised release in the Southern District of Florida.[1] Shortly thereafter, Defendant refused to submit to drug testing and failed to follow the instructions of his assigned United States Probation Officer ("USPO"). On September 25,

---

[1] On November 19, 2015, the Court sentenced Defendant to twenty-four months of custody, to be served consecutively with a previously imposed term of imprisonment, for the offense of "use of unauthorized access devices to obtain $1,000 or more during a one-year period," U.S.C. § 1029(a)(2), a Class C Felony. The term of imprisonment was to be followed by a three-year supervised release.

1

2018, the Court revoked Defendant's supervised release and sentenced him to four months custody of the United States Bureau of Prisons ("BOP"), followed by twenty-nine months of supervised release (ECF No. 93).

Defendant's second term of supervised release commenced on January 23, 2019 and was scheduled to expire on June 22, 2021. On February 22, 2021, Defendant relocated to the Southern District of New York and his supervision was reassigned to USPO Margaret Carrol. While living in New York, USPO Carrol reported that Defendant committed a series of offenses including marijuana use, failing to report as directed, and leaving the judicial district without first securing permission of the USPO. The first three violations alleged in the petition arise from these acts, and Hines admits them.

Moreover, on June 2, 2021, Defendant informed USPO Carrol that he had been involved in a physical altercation and had stabbed another individual in self-defense. Defendant was injured in the incident, sought medical treatment, and obtained stitches for his injuries. The incident was captured on video and broadcasted on the local news. On June 3, 2021, Defendant self-surrendered to the New York City Police Department ("NYPD") and was arraigned in New York Criminal Court.

Per the arrest affidavit, on or about May 31, 2021, Defendant and the alleged victim were involved in a verbal dispute near the Lenox Avenue and 125th Street subway station. The alleged victim entered the subway station and Defendant followed while carrying a broken umbrella in his hands. While in the subway station, the alleged victim pulled out a knife and a scuffle ensued between Defendant and the alleged victim. Defendant received a long slash wound across his forehead and was stabbed multiple times. After eventually wrestling the knife away from the alleged victim, Defendant stabbed the alleged victim multiple times. Defendant left the scene, and the alleged victim was transported to Harlem Hospital for treatment of multiple lacerations to his right shoulder, lower back, and lungs.

On June 8, 2021, the state prosecutor presented the case to a New York Criminal Court Grand Jury. Defendant testified to the grand jury, which voted to not indict Defendant. The state then dismissed the pending charges. This Court signed a Petition on the same date and issued a warrant for Defendant to appear in the Southern District of Florida. He initially appeared on June 21, 2021.

## II.   THE PENDING PETITION FOR REVOCATION

The Petition was filed on June 8, 2021 (ECF No. 123) and charges Defendant with six violations:

1. Violation of Mandatory Condition, by unlawfully possessing or using a controlled substance. On March 16, 2021, the defendant submitted a urine specimen which tested positive for the presence of marijuana in a local laboratory; and subsequently was confirmed positive by Alere Toxicology Services, Incorporated.

2. Violation of Standard Condition, by failing to report to the probation officer as directed. On May 12, 2021, the defendant was instructed via telephone to report to the U.S. Probation Officer on May 19, 2021, and he failed to comply.

3. Violation of Standard Condition, by leaving the judicial district without first securing permission of the probation officer. On or about the week of May 17, 2021 defendant traveled to Miami-Dade County, Florida without securing the permission of the probation officer or the court, as evidenced by the defendant's verbal admission.

4. Violation of Mandatory Condition, by failing to refrain from violation of the law. On or about June 3, 2021 in, New York County, New York, the defendant did commit Criminal Possession of a Weapon, Previous Conviction, 3rd degree, class D felony, contrary to New York Penal Law 265.02(1).

5. Violation of Mandatory Condition, by failing to refrain from violation of the law. On or about June 3, 2021 in, New York County, New York, the defendant did commit Assault with intent: Serious Injury w/Weapon, 1st degree class B felony, contrary to New York Penal Law 120.10(1).

6. Violation of Mandatory Condition, by failing to refrain from violation of the law. On or about June 3, 2021in, New York County, New York, the defendant did commit Assault with Intent to Cause Physical Injury w/Weapon, 2nd degree class D felony, contrary to New York Penal Law 120.05(2).

*Id*. at 2–3. As noted above, Defendant has admitted to violations one, two, and three. An evidentiary hearing was conducted with respect to violations four through six, arising from the alleged violations of New York Penal law.

### III. THE EVIDENTIARY HEARING

At the evidentiary hearing, the Government called one witness to testify, Detective Omar Vargas of the NYPD, the investigating officer assigned to the New York case. The Government filed the admitted hearing exhibits, consisting of videos of the incident from the subway station surveillance cameras, street surveillance, photographs of the crime scene, photographs of the alleged victim and Defendant, as well as an investigation report from Detective Vargas. The Court admitted the exhibits on September 21, 2021. Defendant testified on his own behalf. Defendant's assigned USPO from the Southern District of Florida also attended the hearing and reported that Defendant had been fully compliant while previously under her supervision. The following is a brief summary of the testimony presented.

#### A. Testimony of Detective Vargas

Detective Vargas testified on September 21, 2021, that he was the primary investigating officer for a stabbing incident that occurred on or about May 31, 2021 at the Lenox Avenue and 125th Street subway station in New York City. Detective Vargas testified that after receiving notice of the incident, he reported to Harlem Hospital and conferred with the nursing staff to ascertain the condition of the alleged victim. Detective Vargas learned in his investigation that the alleged victim and assailant were known to each other. Detective Vargas took photographs of the alleged victim's multiple injuries, which included lacerations among other stab wounds to the chest, and upper and lower back. Detective Vargas testified that the alleged victim also suffered a collapsed lung. The Court admitted the photographs of the alleged victim's wounds as exhibits 18, 19, and 20. Detective Vargas testified that he investigated the subway station crime scene and took multiple photographs.

4

On the ground at the crime scene, Detective Vargas observed blood and two broken umbrella handles.  The Court admitted these photographs as exhibits 8 through 11.

Detective Vargas next testified that the NYPD published a "wanted poster" and video to the local news in an attempt to identify and arrest the individual involved in the subway stabbing. Vargas testified that after the news aired, he received a call from a man who identified as the one wanted, who told him that he (the caller) had been menaced by the alleged victim.  The caller promised to turn himself in with his attorney and indeed, Defendant turned himself in to the NYPD a few days later while accompanied by a lawyer.  After being arrested, Defendant was processed, and Detective Vargas took photographs of Defendant's front and side profiles.  The photographs show a significant slash across Defendant's forehead, held together with large sutures.  The Court admitted these photographs as exhibits 12 through 17.

On cross examination, Detective Vargas agreed that this particular subway station is an area visited by significant crime and assaults, and the station is usually staffed with police in uniform.

### B. Testimony of Defendant

Defendant testified on September 21, 2021 that during the early morning of May 31, 2021, while on the way to a Memorial Day picnic, he had an altercation with the alleged victim outside of the Lenox Avenue and 125th Street subway station.  Defendant explained that a few days prior, the alleged victim had sold him a non-functioning speaker for $20.00.  Though the alleged victim apparently agreed to replace the speaker, he did not.  Prior to the events on Memorial Day, they encountered each other a few weeks before and, on that date, the alleged victim brandished razor blades and threatened him.

The video played at the hearing shows that on the day of the incident, the alleged victim is engaged with several people on the street on a rainy day.  Defendant approached with a cup of coffee in his hand and the alleged victim charged him.  Defendant testified that as soon as alleged victim

5

saw him, he said, "I have something for you," and pulled out a knife and a razor blade and began slashing at the Defendant. Defendant raised his jacket to protect himself, however, the alleged victim sliced Defendant's hand while chasing him into the street. Defendant testified that the witnesses on the street yelled at the alleged victim to stop and one witness eventually intervened, moving the alleged victim away.

The alleged victim walked into the subway station. Unsure if he would be attacked again, Defendant claims he grabbed a discarded umbrella as a means of protecting himself and walked into the subway station to notify law enforcement of the attack. Defendant testified that his intention upon entering the subway was to not let the alleged victim get away with what he had just done. Defendant testified that due to the high crime nature of the area, NYPD officers typically patrolled that subway station. Furthermore, since he did not know the name of the alleged victim or where to find him, Defendant sought to report the incident in person so the alleged victim would be held accountable for his actions.

When Defendant entered the subway station, Defendant testified, he found no police officer and "everything changed." He saw the alleged victim with a group of people and the alleged victim began coming after Defendant. He and the Defendant began to fight, eventually falling to the ground. The video images of the altercation in the subway show that Defendant is much taller than the alleged victim, and at one point, he forcibly shoves the alleged victim up against a wall. The video also shows a third individual, who Defendant testified was among the group with the alleged victim in the station, attack Defendant as he attempted to disarm the alleged victim. That person repeatedly stabbed the Defendant with a box cutter, inflicting the gash across his forehead.

Defendant disarmed the alleged victim, who can be seen on the video scrambling again to regain the box cutter. Defendant first pushed him down to stop him from going for the weapon. Defendant at that point had taken the knife from the alleged victim. He testified that he then panicked

and began slashing and stabbing the alleged victim in self-defense. He contends that his vision was obscured due to the blood in his eye caused by a significant wound to his forehead. Defendant left the alleged victim in the subway station and sought medical care, to include stitches, for his injuries.

Later, Defendant claims that his image was broadcasted on the local news as the NYPD attempted to identify him and his involvement with the subway station stabbing. He contacted his probation officer and reported that he had stabbed the alleged victim in self-defense. Defendant sought the counsel of his attorney and self-surrendered to the NYPD on June 3, 2021.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In probation revocation hearings, a court must only find that the defendant violated a condition of his supervised release by a preponderance of the evidence, rather than beyond a reasonable doubt. 18 U.S.C. § 3583(e)(3); *see also Johnson v. United States*, 529 U.S. 694, 700 (2000) (noting that, even though such violations can lead to imprisonment, the violation need not be criminal). The Federal Rules of Evidence do not apply in supervised release revocation proceedings. *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994). In weighing whether to admit hearsay testimony in a supervised release revocation proceeding, courts must "balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation." *Id.* (citing *United States v. Penn*, 721 F.2d 762, 764 (11th Cir. 1983)).

The contested violations arise from Defendant's failure to refrain from the violation of law, specifically, allegations that he violated New York Penal Law sections 265.02(1), 120.10(1), and 120.05(2).

A person is guilty under New York Penal Law section 265.02(1), criminal possession of a weapon in the third degree, when "(1) such person commits the crime of criminal possession of a weapon in the *fourth* degree as defined in subdivision one, two, three or five of section 265.01, and

7

has been previously convicted of any crime." N.Y. Penal Law § 265.02(1) (McKinney 2013). The relevant subdivisions of section 265.01, criminal possession of a weapon in the fourth degree, are:

> (1) He or she possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star"; or
>
> (2) He or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another; or
>
> (3) ;[2] or
>
> (5) He possesses any dangerous or deadly weapon and is not a citizen of the United States.

N.Y. Penal Law § 265.01 (McKinney 2019).

A "weapon" is "an instrument of offensive or defensive combat." *Matter of Jamie D.*, 453 N.E.2d 515, 517 (N.Y. 1983) (citation and internal question marks omitted). Although section 265.01 does not list every type of "weapon," it does include the terms "dagger, dangerous knife . . . or any other dangerous or deadly instrument." N.Y. Penal Law § 265.01(2) (McKinney 2019). A dagger which "may possibly be employed for utilitarian purposes, is primarily intended for use as a weapon." *Matter of Jamie D.*, 453 N.E.2d at 517. Likewise, a dangerous knife, "in the context in which it appears . . . connotes a knife which may be characterized as a weapon." *Id*. A dangerous instrument, on the other hand, is not inherently a weapon but may become a weapon based on use. *See People v. Carter*, 423 N.E.2d 30, 31–32 (N.Y. 1981) (emphasis in original) (where a dangerous instrument, "no matter how innocuous it may appear to be when used for its legitimate purpose, *becomes* a dangerous instrument when it is used in a manner which renders it readily capable of causing serious physical

---

[2] So in original.

8

injury"). "It is the temporary use rather than the inherent vice of the object which brings it within the purview of the statute." *Id*.

Although possession of some weapons is illegal *per se*, there are certain instances, like self-defense, where "mere possession is not itself unlawful, [but] the possessory crime is *not* complete absent some unlawful use (or intent to use)." *People v. Richards*, 869 N.Y.S.2d 731 (N.Y. Crim. Ct. 2008) (emphasis in original). "A justified use is not an unlawful one." *Id*. Therefore, a person who possesses a weapon with intent to use it lawfully in self-defense is not guilty of the crime of possession of a weapon with the intent to use it unlawfully.[3] *See People v. Spry*, 28 N.Y.S.3d 650 (N.Y. Crim. Ct. 2016) (granting defendant's motion to dismiss the sole count of criminal possession of a weapon in the fourth degree because he possessed a knife for self-protection purposes and the People insufficiently plead his unlawful intent to use that knife).

Defendant testified that he grabbed a discarded umbrella from the street, effectively peeled the plastic from the metal frame, and carried it with him as a means of protection. Defendant had just been in a physical altercation with the alleged victim on the street outside of the subway station, suffering a hand wound in that fight. I credit Defendant's testimony that his intention with the umbrella was not to use it in an offensive manner in pursuit of the alleged victim but rather in self-defense should he be attacked once again. Regarding his possession of the alleged victim's knife after the situation escalated inside the subway station, Defendant successfully disarmed the alleged victim after being attacked. I again credit Defendant's testimony at the hearing that his intention in

---

[3] The Court notes *People v. Almodovar* 464 N.E.2d 463 (N.Y. 1984) ("a person either possesses a weapon lawfully or he does not and he may not avoid the criminal charge by claiming that he possessed the weapon for his protection") and *People v. Pons* 501 N.E.2d 11 (N.Y. 1986) ( "there are no circumstances when justification ... can be a defense to the crime of criminal possession of a weapon") as involving firearms which are illegal *per se*. Unlike firearms, mere possession of a particular type of weapon, such as a dagger, knife, or even a broken umbrella, is not unlawful absent evidence that the possessor intended to use that weapon unlawfully against another. *See Spry*, 28 N.Y.S.3d 650.

9

possessing the knife was to stop the attack on himself, and I accept that he did not act with the intent to use it unlawfully against another.

A person is guilty under section 120.10(1) of assault in the first degree when "(1) with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.10(1) (McKinney 2019). "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10) (McKinney 2019); *compare People v. Sleasman,* 805 N.Y.S. 2d 736 (N.Y. App. Div. 2005) (stab wound to neck closed with butterfly sutures was not a serious physical injury); *People v. Castillo,* 604 N.Y.S. 2d 220, 222 (N.Y. App. Div. 1993) (two stab wounds required suturing and victim missed work for two weeks was not a serious physical injury); *People v. Adames*, 859 N.Y.S. 2d 725 (N.Y. App. Div. 2008) (stab wounds in chest and back that required no stitches and caused no damage to organs was not a serious physical injury); *with People v. Barbuto*, 6 N.Y.S.3d 369 (N.Y. App. Div. 2015) (stab wounds to the back of the neck and the back of the chest, causing victim to suffer a collapsed lung, was sufficient to establish serious physical injury); *People v. Wright*, 482 N.Y.S.2d 591 (N.Y. App. Div. 1984) (victim, who suffered total collapse of left lung and partial collapse of right lung as result of stab wounds, suffered serious physical injury).

Similarly, a person is guilty under section 120.05(2), assault in the second degree, when "(2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.05(2) (McKinney 2016). A "Physical injury" is an "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9) (McKinney 2019); *see also People v. Travis,* 711 N.Y.S.2d 514, 518 (N.Y. App. Div. 2000). "[W]hile 'slight or trivial pain' is insufficient, the '[p]ain need not, however,

be severe or intense to be substantial.'" *People v. Rivera,* 838 N.Y.S.2d 727, 728 (N.Y. App. Div. 2007), *lv. denied* 874 N.E.2d 759 (N.Y. 2007) (quoting *People v. Chiddick*, 866 N.E.2d 1039, 1040 (N.Y. 2007) (finding sufficient evidence to support the physical injury required for a second-degree assault conviction; victim described continuing pain for several days after attack to such a degree that she had difficulty caring for her three-year-old child, stopped her regular exercise routine, and experienced problems trying to sleep because of discomfort)).

Justification is a valid defense to assault in the first or second degree. N.Y. Penal Law § 35.15 (McKinney 2004). A person is justified by using:

> "physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless
>
> (a) The latter's conduct was provoked by the actor with intent to cause physical injury to another person; or
>
> (b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force; or
>
> (c) The physical force involved is the product of a combat by agreement not specifically authorized by law."

*Id*. Justification in the use of force to defend oneself "renders such conduct entirely lawful." *People v. McManus,* 496 N.E.2d 202, 205 (N.Y. 1986).

Nevertheless, the statute specifies several limitations to the use of physical force as a justification defense. One such limitation is that the actor was the "initial aggressor," as in the one who first attacks or threatens to attack. N.Y. Penal Law § 35.15(b) (McKinney 2004). Notwithstanding, a person who reasonably believes that another is about to use offensive physical force upon him need not wait until he is struck or wounded. *People v. Valentin*, 74 N.E.3d 632, 634

(N.Y. 2017). He may be the first to use physical force but so long as he reasonably believed it was about to be used against him, he is then not considered to be the "initial aggressor." *Id*.

Here, after entering the subway station, video surveillance indicates Defendant dried his feet and almost immediately encountered the alleged victim who had been standing near the subway platform with a group of unidentified individuals. The alleged victim approached Defendant with two knives and lunged towards him. Along with the altercation that occurred a few minutes prior as context, Defendant reasonably believed that the alleged victim would use physical force against him. Of significance, the video shows that when the alleged victim first confronted him in the subway station, Defendant's arms hung at his side, while the alleged victim pointed a large knife at his body. I find Defendant was not the initial aggressor and was justified in using the physical force that ensued.

To justify the use of deadly physical force, the evidence must establish that the defendant reasonably believed he was in imminent danger of being subjected to deadly physical force, and he either satisfied his duty to retreat or was under no such duty. *See People v. Goetz*, 497 N.E.2d 41, 47 (N.Y. 1986); *People v. Johnson*, 25 N.Y.S.3d 510, 512 (N.Y. App. Div. 2016); *see also* N.Y. Penal Law § 35.15[2] (McKinney 2004). Deadly physical force is defined as force that, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury. N.Y. Penal Law § 10.00[11]. In particular, "[t]here is no duty to retreat before using physical force but one may not use deadly physical force 'if he knows that he can with complete safety as to himself and others avoid the necessity of doing so by retreating.'" *Matter of Y.K.*, 663 N.E.2d 313, 315 (N.Y. 1996) (quoting N.Y. Penal Law § 35.15[2][a]).

In *Matter of Y.K.*, the respondent, while pinned to the ground by the complainant, used a kitchen knife to stab the complainant in the head and back as other group members kicked respondent's body, head, and face. 663 N.E.2d at 314. The New York Court of Appeals affirmed

the Appellate Division's finding that at the time the respondent was initially confronted with physical force and chose to face her aggressors to avoid further attacks, she was under no duty to retreat. *Id*. at 315. "She was the victim of an unprovoked attack and was justified in using physical force to meet the physical force used against her." *Id*. The respondent's duty to retreat arose when the situation escalated. *Id.* The respondent was thrown to the ground and held down as others kicked her face, head and body. *Id*. While under a duty to retreat she was unable to safely do so; therefore, her use of deadly physical force, i.e. stabbing the complainant in self-defense, was justified. *Id*.

Crediting the Defendant's testimony that he entered the subway station to find a police officer and report the initial altercation, Defendant, upon entry, was confronted by the alleged victim who brandished two knives. The two fought, and eventually the fight escalated to the ground. Another unidentified individual began slashing Defendant, cutting his forehead. With his vision obscured by blood from his forehead wound, Defendant slashed and stabbed, in a panic. Like *Y.K.*, Defendant had no duty to retreat at this point as he was unable to safely do so. *See id*. at 314. Defendant justifiably used deadly physical force and stabbed the alleged victim in the chest and back.

## V. RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that the District Court adopt the finding that Defendant violated his conditions of supervised release as alleged in the Petition at Violations 1-3, which Defendant has admitted, and hold a sentencing hearing to determine the appropriate disposition. I similarly recommend that the Court adopt these findings on Violations 4-6, and deny the Petition to revoke his supervised released premised on these violations.

## VI. OBJECTIONS

Pursuant to Local Magistrate Rule 4(b) and Federal Rule of Civil Procedure 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Any request for an extension of this deadline must be made

within seven (7) calendar days from the date of this Report and Recommendation. Failure to timely file objections shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the report and shall bar the parties from challenging on appeal the District Judge's Order based on any factual or legal conclusions included in this Report to which the parties failed to object. 28 U.S.C. § 636(b)(1); *Resolution Tr. Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

      **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 8th day of October, 2021.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE